UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br><br>v. )<br><br>BARRY J. CADDEN, et al. )<br><br>Defendants. ) | Criminal No.: 14-cr-10363-RGS<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' OBJECTIONS TO THE JULY 13, 2015 ORDER OF THE
MAGISTRATE JUDGE (BOAL, M.J.) ON DEFENDANTS'
PRELIMINARY MOTION TO COMPEL DISCOVERY**

The Federal and Local Rules of Discovery are not rigid codes that must be applied in the same manner in every case. Instead, their application must be tailored to fit the unique characteristics of each case and to achieve the goals set out in Fed. R. Crim. P. 2: "to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." Fed. R. Crim. P. 2; *see also* Advisory Committee Notes, Rule 16, 1974 amendment ("[Rule 16] is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases.")

The sprawling allegations in this case and immense volume of discovery present unique challenges to the defendants, especially the eight defendants represented by court-appointed counsel. The indictment charges 131 counts, including, within a single RICO charge, a total of 78 alleged racketeering acts, 25 of which charge two of the defendants (Cadden and Chin) with second degree murder in violation of the homicide laws of seven different states. The government's first five discovery productions included approximately 8.8 million pages of

documents, with a total of over 600 *gigabytes* of information. Its productions to date have also included 34 separate discs containing nearly 1,000 photographs and hours of audio and video recordings.

Defendants made a series of preliminary discovery requests to try to streamline the case and to eliminate unreasonable expense and delay. These requests were aimed at gaining the tools necessary to navigate through this massive amount of discovery. They also sought to identify what materials the government had not provided and to gain access to them.

The government rejected these requests, asserting that it had satisfied its obligations by giving defendants access to all of the discoverable materials that it had deemed relevant. The government refused to gather and produce documents from certain agencies that were involved in the government's investigation. It refused to identify the search terms it used to reduce the entire universe of material it seized/subpoenaed to the more limited subset that it produced. It refused to identify a preliminary list of the documents that it anticipates using in its case-in-chief. It even refused to identify any exculpatory material that it is aware of within the 8.8 million pages. As a result, the defendants filed their Preliminary Motion to Compel Discovery. *See* Docket 231.

Magistrate Judge Boal denied each of the defendants' discovery requests with one minor exception. *See* Docket 288.[1] In one instance (defendant's request for a preliminary exhibit list), Magistrate Judge Boal also suggested that only this Court had the discretion to decide the issue. Defendants respectfully submit that Magistrate Judge Boal erred in denying defendants' requests for the discovery listed below. Defendants further request that this Court exercise its inherent discretion and grant these requests for:

---

[1] Magistrate Judge Boal ruled that the government must produce any draft interview memoranda that are inconsistent with the agent's final report. *See* Docket 288 at 17.

(1)     A list of the Bates numbers of each document that was shown to a witness and referred to in an interview report, but was not produced with the interview report or identified by Bates number;

(2)     Documents from various State and Federal Agencies that participated in the government's investigation;

(3)     A list of the search terms applied by the government to capture the 8.8 million pages of materials it produced to defendants;

(4)     A preliminary list of the government's anticipated trial exhibits;

(5)     An order requiring the government to set a date, well in advance of trial, for the production of Grand Jury Transcripts and Exhibits; and,

(6)     A list of all known *Brady* material within the government's production.

Magistrate Judge Boal's decision with respect to Federal and State agencies (issue 2) was clearly erroneous and contrary to the law. As detailed below, there is clear evidence that these agencies participated in the prosecutorial and investigative efforts that resulted in the indictment. In addition, Magistrate Judge Boal's approach on issues 1 and 3 through 5 missed the broader point, which is that in a case with these distinctive features (a massive volume of discovery, expansive allegations, and fourteen defendants, eight of whom have appointed counsel operating under tight budgets), the government's obligation must be assessed differently than in a typical case, and the government must do more. Defendants are not asking the government to do the defendants' work, but are instead requesting that the government take a few simple actions that will level the playing field and eliminate unjustifiable expense and delay. These actions, which would require little time or effort by the government, would save defendants thousands of hours

of unnecessary work and significant financial resources. They also would help achieve the goal

of the Federal and Local rules, which is to allow the parties to effectively prepare for trial.

## ARGUMENT

**(1) The Court should compel the Government to identify the Bates numbers of each document that was shown to a witness and referred to in an interview report, but was not produced with the interview report or designated by a Bates number**

When the government produces materials in discovery, it must produce them in complete

form. For interview memos (like grand jury transcripts), complete form means including all

documents referred to in them, particularly in a document-intensive case like this, where the

most important parts of the interviews are generally descriptions of the witnesses' responses to

questions about documents they were shown. In such a case, like this one, the interview reports

are incomplete, and of greatly diminished value, without attaching or giving a Bates number

allowing efficient retrieval of the documents the witnesses were shown, as those documents are

part and parcel of the reports themselves.

Defendants originally requested that the government attach to each interview

memorandum all of the documents and exhibits referenced therein. *See* Docket 231 at 3-4. The

government refused this request and, as part of its Opposition to Defendants' Preliminary Motion

to Compel, noted its repeated offers to assist defense counsel with any questions about discovery.

Docket 237 at 6 n. 6. The government also noted that it had previously assisted a defense

counsel in this case by identifying the Bates number of an interview memorandum exhibit. *Id.*

Magistrate Judge Boal, in reaching her decision on this issue, relied on the government's

representation that it would assist defense counsel in identifying exhibits to witness interviews.

Specifically, Magistrate Judge Boal, wrote:

> Where the exhibits were identified by description, the detail of the
> description varied. However, the government has offered to assist

defense counsel with questions about discovery, including identification of exhibits to witness interviews. In light of the government's representation and the fact that the defendants have not cited to any authority to support this request, the Court denied Request I.

Docket 288, at 5.

The defendants decided to take the government up on its offer to provided assistance. Defendants' initial review of the government's interview memoranda revealed that in 76 different interviews, the agent conducting the interview had not identified a document or documents shown to the witness by Bates number and did not include these documents with the interview memoranda. Instead, the agent only included a general description of such documents. For example, the government's Memorandum of Interview of Belmira Carvalho, a key NECC employee, (Interview Memo found at Bates Nos. DOJ_NECC001490969-001490975) references 7 exhibits. It describes those exhibits as follows: (1) "Email concerning 'Missouri issue'"; (2) "Email concerning a 'Virginia issue'"; (3) "Email that discussed Carvalho's contact with an NECC salesperson'"; (4) "Email re a 2008 'ratios' example"; (5) "Email concerning Beyond Use Dating (BUD)"; (6) "Email concerning 'up sell' which was a new part of a customer order concerning the NECC Sales dept."; and, (7) "Email relating to the fact that NECC growing too fast became too busy."

In a July 29, 2015 letter, the defendants requested the government identify the Bates numbers that correspond to the general description documents identified in these 76 interview memoranda. *See* July 29, 2015 letter, attached hereto as Exhibit 1.[2] The defendants noted that if they inadvertently missed any folders containing these general description documents pertaining

---

[2] The defendants provided two separate charts listing the 76 interview memoranda by name, date and Bates number. Chart A listed interview memoranda in which the agent used a general description, rather than Bates numbers, for all of the documents identified in the memo, and did not separately include these documents. Chart B listed interview memoranda in which the agent used a general description rather than Bates numbers for some, but not all, of the documents designated, and did not separately include those "general description" documents.

to particular interviews, they would appreciate the government's assistance directing the defendants to these documents. *Id.*

In a letter dated July 31, 2015, the government rejected the defendants' request, stating that the defendants' letter "fails to identify which exhibits [the Defendants] are unable to locate." *See* July 31, 2015 letter, attached hereto as Exhibit 2. The government further asserted that it believes that many of the general description documents are easily discoverable with minimal effort. *Id.*

Given the government's high level of organization in this case, there is little doubt that the U.S. Attorney has a listing, chart, or spreadsheet directing it to each of these documents, and has had it since the date each interview report was produced. The government also has direct access to the agents who conducted these interviews and can easily confirm exactly which documents the witnesses were shown. By refusing defendants' request, the government is just trying to make much harder – and unnecessarily so – the efficient retrieval of these documents and the usefulness of these interview reports. In the vast majority of cases (e.g., "Email concerning 'Missouri issue'"), it is an impossible task for defense counsel to find the general description documents even with an exhaustive effort.[3]  In those rare instances when defense counsel can find a document that they believe is the right one, there never can be any certainty without a Bates number because there are 8.8 million pages of documents and many documents have several versions. Moreover, it would take dozens of hours for defense counsel – eight of whom are court-appointed – to locate materials that are readily available to the government and

---

[3] Even in situations when the general description of the document identifies the author, recipient, date and subject matter, the defendants are often unable to identify the document with any precision because many emails appear multiple times in the voluminous discovery, and often are part of different email chains.

can be transmitted to the defense at the swipe of a keyboard. And even with that expenditure of time, there is no assurance they would be able to locate all or many of the documents.

The government's offer of "assistance" is illusory, and it should be ordered to produce forthwith a listing of the Bates numbers or other specific information permitting the retrieval, in a time-efficient way, of each document that was shown to a witness and not produced with the interview report or designated by a Bates number. The government had two years to conduct its investigation, including all of these witness interviews, and now the defense is literally scrambling to make sense of 8.8 million pages of documents in order to prepare for a trial date that is eight months away. The government should not be allowed to continue to play a game of hide-and-seek with the documents, as it will only serve to create unnecessary issues for the Court and all parties at trial.

**(2) Magistrate Judge Boal's Order denying Defendants' Motion to Compel Discovery from numerous Federal and State agencies was clearly erroneous and contrary to the law because there is ample evidence of joint investigations between the Government and these agencies.**

Magistrate Judge Boal's order denying the defendants' motion to compel discovery from these federal and state agencies was clearly erroneous and contrary to the law. *See* 28 U.S.C. § 636(b)(1)(A). Pursuant to Federal Rule of Criminal Procedure 16 and Local Rule 116.8, the government must produce all discoverable information that is within its "possession, custody, or control" and is "material to preparing the defense." *See U.S. v. Libby*, 429 F. Supp. 2d 1, 5 (D.D.C. 2006). The government is not only required to produce those materials in the possession of the prosecutorial team, it must also produce discoverable information in the possession, custody, or control of other agencies that participated in the investigation leading to the indictment. *See U.S. v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003); *Libby*, 429 F. Supp. 2d at 6; *U.S. v. Ramos-Cartagena*, 9 F. Supp. 2d 88, 90 (D.P.R. 1998).

Whether an agency is considered part of the prosecutorial team depends on the agency's level of involvement. *See Ramos*, 9 F. Supp. 2d at 91 (citations omitted). The inquiry is not if the materials are in the government's actual possession, but rather, whether there was a joint investigation. *See id.* Factors considered by the court in determining whether a joint investigation occurred include: "(1) whether one agency acts on behalf of or under the control of another; (2) the extent to which the two agencies are working as a team and are sharing resources; and (3) whether the agency charged with possession of evidence in the other agency's file had ready access to it." *United States v. Ferguson*, 478 F. Supp. 2d 200, 238-239 (D. Conn. 2007) (*citing U.S. v. Risha*, 445 F.3d 298, 304 (3rd Cir. 2006)).

The Department of Justice has provided guidance to prosecutors on how to handle this issue: "Prosecutors are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes. Carefully considered efforts to locate discoverable information are more likely to avoid future litigation over *Brady and Giglio* issues and avoid surprises at trial."[4]

The government did not heed the DOJ's instruction to "err on the side of inclusiveness." In response to defendants' discovery requests, the government asserted that certain agencies did not "formally" participate in the investigation, despite clear evidence to the contrary. Docket 288 at 6, n. 3. Specifically, the government refused to produce discoverable information in the possession, custody, or control of Massachusetts Department of Public Health ("DPH"); Massachusetts Board of Pharmacy; Michigan Attorney General's Office; Drug Enforcement Agency; the Department of State; and, and the Department of Health and Human Services. *Id.* Magistrate Judge Boal erroneously agreed with the government's analysis, overlooking the

---

[4] Memorandum from Deputy Attorney General David W. Ogden, Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), *available at* http://www.justice.gov/dag/memorandum-department-prosecutors.

extensive evidence showing that these agencies' collaborative work with the government

contributed to the indictment. Docket 288 at 6-10.

### A.    DPH and the Board of Pharmacy

The government excluded DPH and the Board of Pharmacy (which is part of DPH) from

its designation of "formal" participants despite the irrefutable evidence that they participated in

the inspections and investigations of NECC. In response to defendants' discovery requests, the

government acknowledged that the FDA formally participated in the investigation, but asserted

that DPH and the Board of Pharmacy did not. *See* Docket 237 at 8-9. However, at the June 30,

2015 motion hearing, the government appeared to change its tune, admitting that there was

collaboration and joint efforts between the Board of Pharmacy and the FDA for nearly a two

week period from September 25, 2012 through October 5, 2012.[5] Transcript of 6/30/15 hearing

("Transcript"), attached hereto as Exhibit 3, at 14. Specifically, the government admitted that

DPH investigators "*went with* the FDA inspectors" and were present with FDA inspectors at the

NECC offices for nearly two weeks. *Id.* (emphasis added). The government tried to brush aside

these joint efforts by stating "[DPH's] involvement ended on October 5[th]." *Id.* at 15. But even if

true, this does not affect the analysis. 2 weeks is 2 weeks no matter how you slice it, and there is

no restriction on how long the joint participation must last.

Moreover, DPH has made clear in its own documents that it formally participated in the

investigation. In the Board's Order to Show Cause, dated November 28, 2012, the Board stated

---

[5] The government misstated the date that DPH's and FDA's joint investigation apparently ended. DPH and FDA investigators were both onsite at NECC on October 9, 2012. A week later, on October 16, 2012, Special Agent Benedict Celso from the FDA Office of Criminal Investigations signed a 21-page Affidavit for Search Warrant that relied in large part on the information gathered during these joint inspections of NECC. On this same date, US Attorney Carmen M. Ortiz confirmed in a public statement that her office and law enforcement partners were actively investigating allegations concerning NECC. See October 16, 2012 Statement from U.S. Attorney Carmen M. Ortiz regarding the New England Compounding Center, *available at* http://www.justice.gov/archive/usao/ma/news/2012/October/NewEnglandCompoundingCenterStatement.html.

that its "investigators in collaboration with the United States Food and Drug Administration (collectively, 'investigators') began a joint investigation of NECC." *See* Order to Show Cause, attached hereto as Exhibit 4. In its Board Preliminary Investigation it further acknowledged:

> The Massachusetts Department of Public Health (DPH) has taken immediate action to protect the public health and safety. In collaboration with investigators from the U.S. Food and Drug Administration (FDA), DPH investigators have worked to identify the root causes of these events."

> *See* Docket 231-3 at 3.

DPH noted its "coordinated," "collaborative" and "joint" investigative efforts with the FDA throughout the remainder of the body of its report:

- "DPH investigators principally communicated with three NECC staff members during the on-site investigation...along with FDA investigators." *Id.* at 3.

- On September 27, 2012, "DPH coordinated with FDA to plan a collaborative investigation of NECC." *Id.* at 6.

- On October 1, 2012, "DPH and FDA began a joint investigation at NECC." *Id.*

- "The Department's collaborative investigation with the FDA is comprehensive and will continue until investigators have all information needed to determine what, if any, further action should be taken against NECC and its leadership." *Id.,* at p. 9.

Lastly, in recent months, the government has tried to quash deposition subpoenas to both FDA and Massachusetts Board of Pharmacy witnesses in a related civil case. *See* 1:13-md-02419-RWZ, Document 1838-3 and Document 1976. In both instances, U.S. Attorney Carmen Ortiz submitted a nearly identical Declaration. *Id.* In her Declaration relating to the Board witnesses, U.S. Attorney Ortiz admitted that these witnesses have knowledge of the nature of the evidence seized through her office's criminal search warrants – knowledge which only could

have come through a joint investigation.  Specifically, U.S. Attorney Ortiz declared, under penalty of perjury:

> [C]onducting a deposition of one or more [Massachusetts Board of Pharmacy] witnesses now could generate substantial pretrial publicity that could affect the rights of the 14 criminal defendants to a fair trial. . . . In a high-profile matter such as this, it is likely that such widespread use of the deposition testimony will result in leaks and disclosures of the testimony, in whole or part, to the media, inadvertently or otherwise.  Premature disclosure about the government's case, including potential witnesses' testimony or *details regarding the nature of evidence seized through search warrants*, could affect the ability to seat a fair and impartial jury in the criminal case."

> See 1:13-md-02419-RWZ, Document 1976, at Exhibit A ¶ 14.

The government also acknowledged in this context that any depositions of Board witnesses would require the presence of an AUSA to help prepare their testimony.  *Id.* at 2; *see also Id.* at Exhibit A ¶13.  The government can not have it both ways – claiming in one situation that Board witnesses can not be deposed because of their knowledge of the government's investigation, and claiming now that they are not part of the prosecutorial team.

Given DPH's and the Board of Pharmacy's high level of involvement and joint participation, the government must actively reach out to these agencies and produce all discoverable information in their possession, custody, or control.  *See U.S. v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003); *Libby*, 429 F. Supp. 2d at 6.  It is not enough for the government to assert, as it has done here, that it produced all the materials in its possession.  Docket 237 at 10, n. 11.

## B.    Michigan Attorney General

Magistrate Judge Boal also erred in concluding that the government does not have to produce discoverable documents from the Michigan Attorney General's investigation. In reaching this conclusion, Magistrate Judge Boal focused on the fact that joint witness interviews do not amount to a joint investigation prompting any additional discovery obligations on the part of the government. *See* Docket 288, at 9. But there is much more than evidence of joint interviews. The available evidence demonstrates that the collaborative effort of these agencies, working together as a team, resulted in the indictments.

Michigan Attorney General Bill Schuette was explicit about the high level of cooperation between his office and the U.S. Attorney's Office at the December 17, 2014 press conference announcing the indictments. After flying to Boston for the press conference, Attorney General Schuette noted that "cooperation [between his office and the U.S. Attorney's Office] *led to* today's indictment." *See* December 17, 2014 Press Conference. At the same press conference, Attorney General Holder and U.S. Attorney Ortiz recognized Attorney General Schuette as having provided "assistance and cooperation" throughout the investigation.[6]

Likewise, a press release from Michigan Attorney General Schuette's office on the same day noted, "[o]ngoing coordination between state and federal investigators has maximized the resources dedicated to this investigation and resulted in the serious criminal charges announced today."[7] Attorney General Schuette's press release goes on to note the "historic level of

---

[6] Press Release, Department of Justice (Dec. 17, 2014), *available at* http://www.justice.gov/opa/pr/14-indicted-connection-new-england-compounding-center-and-nationwide-fungal-meningitis.

[7] Press Release, Michigan Attorney General (Dec. 17, 2014), *available at* http://www.michigan.gov/ag/0,4534,7-164-46849_47203-343672--,00.html.

cooperation" characterizing the investigation which involved "extensive amounts of evidence."

*Id.*

This cooperation spans more than just a joint announcement of the indictments. In March 2013, the Michigan Attorney General convened a grand jury that investigated much of the same conduct that the U.S. Attorney ultimately alleged in the indictment. Throughout the investigation, the government and the Michigan Attorney General's Office conducted joint interviews of "Michigan-based victims." *See* Docket 237 at 10-11.

This joint effort was further illustrated when U.S. Attorney Ortiz flew to Michigan and announced on November 25, 2013 a "new coordination" between her office and the Michigan Attorney General's Office.[8] U.S. Attorney Ortiz noted that she was "grateful for the cooperation of the Michigan Attorney General's Office in this important investigation." *Id.* This sentiment was reiterated by Michigan Attorney General Bill Schuette who said, "This *agreement* with the United States Attorney Oritz will allow us to coordinate with federal officials and maximize the resources dedicated to this investigation." *Id.* (emphasis added). These statements clearly demonstrate a joint investigation between the Michigan Attorney General and the U.S. Attorney's Office, requiring the government to produce all discoverable material in the possession, custody, or control of the Michigan Attorney General.

## C.    DEA

Finally, the government failed to list the DEA as a formal participate in the criminal investigation even though it was clearly involved. As part of its discovery productions, the government produced interview memoranda prepared by DEA agents, DEA agents' notes, and documents the DEA seized from NECC. The government tried to distance itself from the DEA

---

[8] Press Release, Michigan Attorney General (Nov. 25, 2013), *available at* http://www.michigan.gov/ag/0,4534,7-164-46849-317084--,00.html.

by claiming that it was not required to produce these documents, and asserting that the DEA's investigation was not coordinated with the U.S. Attorney's Office. Docket 237 at 9. Taken at face value, the government's position would mean that the DEA, which is part of the DOJ, was not part of the DOJ's wide-ranging investigation. This defies logic.[9]

The government is not relieved of its discovery obligations by selecting which agencies it deems to have been "formal" participants in the investigation and claiming it has produced everything it believes the defense is entitled to. *See U.S. v. Bhutani*, 175 F.3d 572, 577 (7th Cir. 1999)(citations omitted) ("The government cannot with its right hand say it has nothing while its left hand holds what is of value"). Contrary to the semantics used by the government to categorize these agencies' involvement as independent, there is clear evidence of the contrary. Thus, the defendants are entitled to discoverable documents and information from these agencies, and the Court should grant defendants' request.

### (3) The Court should compel the Government to produce a list of the search terms it applied to the documents it seized/subpoenaed so Defendants can effectively and efficiently prepare for trial

The government's refusal to provide its list of search terms provides perhaps the best example of the government's overly restrictive approach to the discovery process. During the government's investigation, it executed two search warrants at NECC and seized a massive amount of electronic media, including a computer server containing all of NECC employees' email. Docket 237 at 12. The government then devised and applied a list of search terms to

---

[9] The DOJ's press releases illustrated that participation in this investigation extended the entire way to the top of the DOJ. When the indictment was unsealed, the DOJ issued a press release containing a statement by its then-head, Attorney General Eric Holder, as well as by Acting Associate Attorney General Stuart Delery and Acting Assistant Attorney General Joyce R. Branda for the Justice Department's Civil Division, noting in more than one instance that the DOJ uses every tool at their disposal to hold bad actors accountable. *See* Press Release, Department of Justice (Dec. 17, 2014), *available at* http://www.justice.gov/opa/pr/14-indicted-connection-new-england-compounding-center-and-nationwide-fungal-meningitis. The entire Department of Justice should be covered by the discovery requests, including but not limited to the U.S. Attorney in Massachusetts, the offices of the Attorney General, the Acting Assistant Attorney General, the Criminal Division, and the Civil Division, as well as the FBI and DEA.

narrow the massive universe of electronic media. *Id.*[10] 1.1 million non-privileged email were responsive to the government's search terms. *Id.* at 13. The government's investigation focused on these 1.1 million emails, along with other documents. *Id.* The government produced these 1.1 million emails to defendants as part of automatic discovery. *Id.*

The defendants requested this list of search term to determine whether the government had captured all of the potentially relevant and exculpatory materials. The government refused this request, claiming that the Federal and Local rules do not require disclosure and also asserting that this search term list was work product. Docket 237 at 13. Magistrate Judge Boal ruled that defendants "have not shown that the Government's search terms are material and, therefore, discoverable." Docket 288, p. 11.[11] The Magistrate Judge's decision was clear error and contrary to the law.

Under the circumstances here, where there is an enormous volume of data, sweeping allegations, and a large number of indigent defendants with limited resources, these search terms are material to the preparation of the defense. Defendants are also left in a position in which they have no reasonable way of determining if the Government's search inadvertently omitted relevant and/or exculpatory emails.

Rather than simply providing the search terms, the Government has proposed providing the defendants the "original version of the electronic media seized in this case prior to any

---

[10] Then-counsel for NECC also provided its own list of search terms to the government to identify potentially privileged emails. The government used this list, along with a taint team, to filter out privileged documents.

[11] The government did not cite any relevant legal authority in support of their position that this list constitutes work product, and Magistrate Judge Boal did not address this contention. *See* Docket 237 at 13-14. It is not work product. As counsel noted during the hearing, search terms are commonly exchanged during the course of criminal investigations. Prosecutors frequently agree to allow individuals and corporations who receive grand jury subpoenas to apply search terms to large amounts of electronic data to capture responsive documents. In these situations, the government often requests that counsel for the individual or company disclose the list of search terms that were applied so the government is comfortable that all relevant information was captured.

processing by the government." Docket 231 at 10. The Government's position is that if the defendants want to figure out what materials were not captured by the search terms, they can search the entire universe of seized/subpoenaed documents and then somehow cross-reference this with the 1.1 million emails that have been produced.

This proposed alternative is unreasonable, wasteful, and entirely unnecessary. To begin with, the defendants have already spent tens of thousands of dollars to process the 1.1 million emails and other electronic documents that the government has produced in its first five discovery productions. This Court has appointed a coordinating discovery attorney and approved the expenditure of a significant sum of money for a database for CJA counsel and some non CJA counsel to use to upload, process and to begin to navigate this enormous volume of documents. If the defendants accepted the government's proposal, they would have to reengage a third-party vendor to code and upload this even larger group of materials, which will undoubtedly cost tens of thousands of dollars more. Defendants would then need to spend countless hours trying to determine what emails in this larger group were not included in the original 1.1 million that were produced.

All of this costly and duplicative work can easily be avoided. What will take five minutes to accomplish if the government produced the search terms will take hundreds of hours and tens of thousands of dollars to complete if they do not. The Government should be required to produce these search terms so that defendants can fairly and efficiently prepare for trial.

**(4) The Court should compel the Government to provide a preliminary exhibit list because of the distinctive features of this complex case**

Defendants requested that the Government identify the items it produced in automatic discovery that it intends to use in its case-in-chief.[12] Docket No. 231 at 12. The Government denied defendants' request, asserting that it had satisfied its Rule 16(a)(1)(E) obligation by reserving its right to use any of the documents and tangible items identified in its discovery productions in its case-in-chief. Id. at 12.

Magistrate Judge Boal denied defendants' request, holding that the rule "does not require the Government to disclose an exhibit list at the pretrial discovery stage." Docket 288 at 11. However, in reaching her decision, Magistrate Judge Boal acknowledged that "[i]n a complex case such as this one, it is within the discretion of the District Court to require the Government to comply with this rule well before the seven-day period required by L.R. 117.1(a)(8)(B)." Id. at 12.

It is well settled that this Court has the authority to issue such an order. See U.S. v. W.R. Grace, 526 F.3d 499, 510 (9th Cir. 2008) (emphasis added) (holding that the district court has the authority to issue a pretrial order requiring the government to disclose a final list of witnesses and there was no abuse of discretion in ordering the government to do so a year before trial); U.S. v. Cannone, 528 F.2d 296, 299 (2d Cir. 1975) ("The general discretion of district courts to compel the government to identify its witnesses is acknowledged widely"); United States v. Locascio, No. CRIM 405-476-RBH, 2006 WL 2796320, at *6 (D.S.C. Sept. 27, 2006). This authority is based on the Court's "inherent power to control [its] own docket" "in a manner

---

[12] Fed. R. Crim. P. 16(a)(1)(E)(ii) provides that, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy [materials] . . . (ii) the government intends to use the item in its case-in-chief at trial."

which is as efficient and rational as possible." *U.S. v. Correia*, 531 F.2d 1095, 1098 (1st Cir. 1976); *U.S. v. Santos*, 367 F. Supp. 2d 180, 181 (D. Mass. 2005); *United States v. June*, 2011 WL 4443429 at *2-3 (D. Mass. Sept. 22, 2011). This "inherent power" has been interpreted to provide district courts with wide latitude to manage discovery pursuant to Rule 16 in a manner consistent with the liberal spirit of Rule 2. "The thrust of Rule 16—viewed in light of Rule 2—is to allow the district court to ensure that the parties comply with the letter *and* spirit of the rule." *W.R. Grace*, 526 F.3d at 510 (9th Cir. 2008) (emphasis added).

The distinctive features of this complex case and the principles embodied in Fed. R. Crim. P. 2 (ensuring a just determination, fairness, and eliminating unjustifiable expense and delay) weigh heavily in favor of granting the defendants' request for an early disclosure of the government's preliminary list of exhibits. There is a compelling need for this information. Defendants are confronted with the insurmountable task of wading through the enormous amount of discovery (8.8 million pages of documents, 1,000 photographs, and hours of audio and video recordings) to try to determine what materials are at the heart of the government's case so they can begin preparing a defense. Even with considerable diligence, this will be a near impossible task, especially for the 8 defendants represented by court-appointed counsel, whose resources are limited and dictated by this Court.

There is no reason that the government should be permitted to wait until the eve of trial to produce this information. The government has had a significant head start on the defendants, having investigated this case for over two years. There is little question that at this point, the government has identified the vast majority of the documents and witnesses that it intends to use in its case-in-chief. The defendants are simply requesting that the government be required to

provide a preliminary list of exhibits, recognizing that the government will likely need to supplement this list as it continues to prepare for trial.

Requiring the government to do so at this stage is the most efficient way to streamline this case, preserve resources, and help ensure that the defendants have sufficient time to properly prepare for the April 4, 2015 trial date. *See United States v. Locascio*, No. CRIM 405-476-RBH, 2006 WL 2796320, at *6 (D.S.C. Sept. 27, 2006) (ordering government to identify which specific records, out of 3,000 produced, it may use in its case in chief and noting, "[w]ithout this specific knowledge, the defendants would be left [] guessing...Even with the most reasonable diligence such would be impracticable and akin to 'finding a needle in a haystack'"). For these reasons, the Court should grant the defendants' request for an exhibit list.

### (5) The Court should compel the Government to set a date, well in advance of trial, for its production of grand jury transcripts and exhibits

The Department of Justice has issued guidance for its prosecutors regarding criminal discovery. This guidance encourages prosecutors to provide "broad and early discovery" because "it promotes the truth-seeking mission of the Department and fosters a speedy resolution of many cases."[13] In defendants' experience, the U.S. Attorney's Office for the District of Massachusetts has acted consistently with this DOJ guidance and has provided earlier and broader disclosures than are required by the federal and Local rules and the Jencks Act.

In this case, however, the government has flatly rejected defendants' request for disclosure of grand jury materials. In response to the defendants' request, the government has stated that it has no "desire to impede the defense," and that it "intends to disclose all Jencks material in advance of any trial in this matter." Document 237 at 21. But the government has refused to indicate when it intends to make this disclosure. The government has also failed to

---

[13] Memorandum from Deputy Attorney General David W. Ogden, Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), *available at* http://www.justice.gov/dag/memorandum-department-prosecutors.

provide any rationale for why it does not produce these materials now if it truly does not "desire to impede the defense."

The reason it has not provided any rationale is because there is none. None of the traditional justifications for withholding grand jury materials are present in this case. There are no concerns for protecting victims and witnesses from harassment or intimidation, nor are there concerns about protecting the privacy interests of witnesses. The government has already produced interview memoranda and agents' notes from those witnesses' interviews.

The government's refusal to provide early disclosure of these materials will only serve to hinder the defendants' ability to prepare their defenses, increase the expense, and potentially delay the trial. The defendants will be left trying to prepare for trial without the most critical materials. This makes no sense in terms of the orderly preparation and presentation of evidence, especially given the anticipated volume of grand jury materials. The automatic discovery reflects that the government interviewed at least 300 individuals, in some cases as many as four times. It is safe to assume that during its two-year investigation a significant number of these individuals testified in front of the grand jury, meaning the volume of testimony will be immense. If the government is truly on a "truth-seeking mission" in this case, it will produce these materials now.

In *United States v. Snell*, 899 F.Supp. 17 (D. Mass. 1995), Judge Gertner, exercising the Court's inherent power to control its own docket, ordered the government to provide the Court with an estimate of when Jencks material would be produced and set a date by which the production must be made. In reaching this decision, Judge Gertner noted that "[s]everal courts have ordered early production in the interests of fairness, efficiency, and the avoidance of surprise." *Id.* at 24, citing *United States v. Hubbard*, 474 F.Supp. 64 (D.D.C. 1979) and *United*

*States v. Narciso*, 446 F.Supp. 252, 270-71 (E.D.Mich. 1976) (ordering pre-trial disclosure of

Jencks statements to promote efficiency and fairness).   Judge Gertner further stated that:

> Nothing in the [Jencks] statute, preempts the court's ability,
> consistent with its obligations over case management, to order
> earlier disclosure than required by the Act.  If there is no law
> enforcement reason prohibiting earlier disclosure (i.e. threats to
> witnesses, etc) then the concerns undergirding Jencks are simply
> not triggered.

> *Snell*, 899 F.Supp. at 24.[14]

In light of the lack of any of the traditional justifications for withholding Jencks materials

here, as well as the breadth of the allegations, the volume of discovery, and the particular

challenges confronting court-appointed counsel, the defendants respectfully urge this court to

exercise these powers and direct the government to set a date, sufficiently well in advance of

trial, for its production of grand jury transcripts and exhibits.  It is only with such adequately

advanced disclosures that the defendants will be afforded the opportunity to prepare properly for

this trial.

### (6) The Court should compel the Government to identify all exculpatory evidence that it is aware of within the automatic discovery

Defendants respectfully submit that Magistrate Judge Boal's denial of defendants'

request for the government to identify exculpatory information was clearly erroneous and

contrary to the law.  Magistrate Judge Boal misunderstood the defendants' position in this

regard.  Defendants are not seeking an order compelling "the government to specifically

identify…all of the exculpatory evidence contained within its productions."  Docket 288 at 12-

13.  Nor are defendants asking the Court to "change the balance or the way the criminal

---

[14] Defendants have found two reported decisions in this jurisdiction whose holdings are to the contrary:  *U.S. v. Owens*, 933 F.Supp. 76, 90 (D. Mass. 1996) (Young, J.) (holding that there is no basis for requiring the early disclosure of non-exculpatory Jencks material), and *United States v. Mazzola*, 183 F.Supp.2d 195, n. 1 (D. Mass. Nov. 26, 2001) (Bowler, M.J.) (noting in a footnote that by operation of the Jencks Act, grand jury materials are not subject to pretrial disclosure).

discovery should work," *See* Transcript, Exhibit 3, at 34-35). Defendants are only requesting that the government specifically identify all exculpatory evidence that it is presently aware of in the discovery materials. *Id.* at 19.

The government has refused to comply with this request, asserting that *Brady* is "a rule of disclosure," requiring it to do nothing more than turn over the discovery materials. *Id.* at 34. This narrow interpretation of its obligations, which Magistrate Judge Boal adopted, violates the letter and spirit of Rule 16 and Local Rule 116.2(b)(1).[15] If *Brady* is to have any meaning, then the government should not be permitted to identify an exculpatory document, and then simply bury it within millions of pages of automatic discovery without specifically disclosing it as *Brady* material.

This Court, as a matter of fundamental fairness and in the spirt of Rule 16 and the Local Rule, should order the government to identify all known *Brady* material. *See United States v. W.R. Grace*, 526 F.3d 499, 509-510 (9th Cir. 2008); *United States v. Salyer*, No. CR. S-10-0061 LKK, 2010 WL 3036444, at *1 (E.D. Cal. Aug. 2, 2010) (requiring as a matter of case management and fairness that the government identify *Brady* material within the voluminous documents); *see also* Advisory Committee Notes, Rule 16, 1974 amendment. It is necessary and

---

[15] Magistrate Judge Boal and the government relied on a number of cases that stand for the principle that a failure by the government to identify *Brady/Giglio* information in its discovery production is not cause for finding a *Brady* violation, for reversing a conviction, or for granting a new trial. *See United States v. Morales-Rodriguez*, 467 F.3d 1, 14-15 (1st Cir. 2006) (defendant's conviction and sentence affirmed and no *Brady* violation found where evidence at issue was not material, as it "only served to corroborate the prosecution's theory," and government did not suppress it because the defense was allowed to conduct open-file discovery); *United States v. Rodriguez-Marrero*, 390 F.3d 1, 29 (1st Cir. 2004) (finding no abuse of discretion where district court rejected defendant's claim that the government's failure to identify a one page police report constituted a *Brady* violation and denied defendant's motions for new trial based on various other alleged *Brady* violations); *United States v. Godfrey*, 2013 WL 1414887, at *2 (D. Mass. Apr. 5, 2013) (M.J. Bowler) (finding no *Brady* violation and denying defendant's *Brady* motion where government did not hide *Brady* material within a voluminous file and provided the defendant with "hot docs" that the government was likely to use at trial). This principle is well established. It is also irrelevant to the Court's consideration here. The defendants are not asserting that the government must scour the records and identify every piece of *Brady* material. Likewise, defendants are not contending that the government hid anything. The defendants are merely asking that the government identify all known *Brady* material.

appropriate given the complex nature of this case, the voluminous discovery, and the budgetary concerns of court-appoint counsel. If during the course of government investigation and review of the 8.8 million pages of discovery it has uncovered any exculpatory evidence, it should identify it and not make the defendants needlessly search for it. This only requires the government to disclose information that it already knows, and does not require it to engage in any additional work. Granting defendants' request is also appropriate because it would eliminate unnecessary expense and ensure that there is a timely and just determination. Fed. R. Crim. P. 2.[16]

In addition, the fact that the government has only identified one piece of exculpatory evidence as part of its automatic discovery weighs in favor of granting the defendants' request. More specifically, in its January 14, 2015 discovery letter, under the heading "Exculpatory Evidence Under Local Rule 116.2(b)(1)," the Government identified an exculpatory statement made by one individual. After a grand jury investigation spanning over two years and seven months of trial preparation, it is difficult to believe that this is the only exculpatory statement the Government is aware of. In addition, the Government has not produced a single grand jury transcript even though *Brady* trumps Jencks, and requires production of exculpatory material contained in the grand jury materials as part of automatic discovery. *See United States v. O'Brien*, 2013 WL 1057929 at *5 (D. Mass. Mar. 13, 2013) (government must produce exculpatory information with the meaning of Brady or Local Rule 116.2(a) even if contained in Jencks material); *United States v. Snell*, 899 F.Supp. 17, 21-23 (D.Mass. 1995) (exculpatory

---

[16] The government points to the fact that it provided a list of "hot" and "relevant" document as part of its document productions to further aid the defense efforts, a factor noted by Magistrate Judge Boal in her Order. *See* 288 at 18-19; Docket 237 at 19. Yet pointing the defendants to 15,500 documents does little to meaningfully aid the defense efforts, and says nothing about whether these 15,500 documents contain inculpatory evidence, exculpatory evidence, or both.

material under Brady must be turned over immediately pursuant to Local Rule 116.1, even though it was protected by the Jencks Act); *United States v. Owens*, 933 F.Supp. 76 (D. Mass. 1996).

An instructive case on this issue is *United States v. Hsia*, 24 F.Supp.2d 14, 28 (D.D.C. 1998). In *Hsia*, the government provided the defendant access to over 600,000 pages of documents as part of open file discovery. Although the government asserted that it understood its *Brady* obligations and intended to abide by them, it did not identify a single piece of *Brady* material. *Id.* at 29. Given the magnitude of the government's investigation, the Court viewed this failure to identify any exculpatory evidence with skepticism. *Id.* To ensure that the government complied with its obligation, the Court ordered the government to identify all known *Brady* materials, stating:

> [O]pen-file discovery does not relieve the government of its *Brady* obligations. The government cannot meet its *Brady* obligations by providing Ms. Hsia with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack. *To the extent that the government knows of any documents or statements that constitute Brady material, it must identify that material to Ms. Hsia.*

> *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998) (emphasis added).

This Court should take this same approach, requiring the government to identify all known exculpatory material. There is no rational basis for the government to refuse to do so.

## **CONCLUSION**

Consistent with the purposes of the federal discovery rules, defendants' objections to the Magistrate Judge's Order should be granted.

Dated:   August 3, 2015     Respectfully submitted,

                 BARRY J. CADDEN,
                 By his attorneys,


                 */s/ Bruce A. Singal*
                 Bruce A. Singal (BBO# 464420)
                 Michelle R. Peirce (BBO# 557316)
                 Damien C. Powell (BBO# 664200)
                 DONOGHUE, BARRETT & SINGAL, PC
                 One Beacon Street – Suite 1320
                 Boston, MA 02108
                 Telephone:  (617) 720-5090
                 bsingal@dbslawfirm.com
                 mpeirce@dbslawfirm.com
                 cstein@dbslawfirm.com


                 SHARON CARTER,
                 By her attorneys,


                 */s/ Michael Pineault*
                 Michael Pineault
                 CLEMENTS & PINEAULT, LLP
                 23 Federal Street
                 Boston, MA 02108
                 Telephone:  (857) 445-0133

GLENN CHIN,
By his attorneys,


  /s/  *Stephen Weymouth*
Stephen Weymouth
LAW OFFICE OF STEPHEN WEYMOUTH
65a Atlantic Avenue, Suite 3
Boston, MA 02110
Telephone:  (617) 573-9598


KATHY CHIN,
By her attorneys,


  /s/  *Joan Griffin*
Joan Griffin
P.O. Box 133
Dublin, NH 03444
Telephone:  (617) 283-0954


SCOTT CONNOLLY,
By his attorneys,


  /s/  *Raymond Sayeg, Jr.*
Raymond Sayeg, Jr.
KRATTENMAKER O'CONNOR & INGBER P.C.
One McKinley Square
Fifth Floor
Boston, MA 02109
Telephone:  (617) 523-4010

JOSEPH EVANOSKY
By his attorneys,


  /s/   Mark Pearlstein
Mark Pearlstein
Dana McSherry
MCDERMOTT, WILL & EMERY
28 State Street
Boston, MA 02109
Telephone:  (617) 545-4000


CHRISTOPHER LEARY,
By his attorneys,



  /s/   Paul Kelly
Paul Kelly
Sarah Walsh
JACKSON LEWIS PC
75 Park Plaza, 4th Floor
Boston, MA 02116
Telephone:  (617) 367-0025


ROBERT RONZIO,
By his attorneys,


  /s/   Peter Horstmann
Peter Horstmann
LAW OFFICES OF PETER CHARLES HORSTMANN
450 Lexington Street
Suite 101
Auburndale, MA 02466
Telephone:  (617) 723-1980

ALLA STEPANETS
By her attorneys,


   /s/   *John Cunha, Jr.*
John Cunha, Jr.
Helen Holcomb, BBO #547538
CUNHA & HOLCOMB, PC
One State Street
Suite 500
Boston, MA 02109
Telephone:  (617) 523-4350


GENE SVIRSKIY
By his attorneys,


   /s/   *Jeremy Sternberg*
Jeremy Sternberg
Chris Iaquinto
HOLLAND & KNIGHT
10 St. James Avenue, 11th Floor
Boston, MA 02116
Telephone:  (617) 854-1476


MICHELLE THOMAS
By her attorneys,


   /s/   *Michael Bourbeau*
Michael Bourbeau
BOURBEAU AND BONILLA, LLP
236 Commercial Street, Unit One
Boston, MA 02109
Telephone:  (617) 350-6565

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on August 3, 2015.

_/s/   Bruce A. Singal_
Bruce A. Singal