UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————

|                                   |   |                              |
|-----------------------------------|---|------------------------------|
| UNITED STATES OF AMERICA          | ) |                              |
|                                   | ) | Court No.:  14-cr-10363-RGS  |
| v.                                | ) |                              |
|                                   | ) |                              |
| BARRY J. CADDEN, et al.,          | ) |                              |
|                                   | ) |                              |
| Defendants.                       | ) |                              |

———————————————————

## GOVERNMENT'S OBJECTIONS TO CHIEF MAGISTRATE JUDGE BOAL'S MEMORANDUM AND ORDER DATED DECEMEBER 15, 2015

Pursuant to Rule 59(a) of the Federal Rules of Criminal Procedure and Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, the United States of America hereby objects to the order dated December 15, 2015, by Chief Magistrate Judge Boal (Doc. No. 472) [hereinafter, the "Order"].[1]   The government respectfully submits that the Order directing the government's Filter Team to review "all potentially privileged emails no later than January 15, 2016," id. at 6, was clearly erroneous and contrary to law, and therefore should be overturned.

First, the government submits that the Order erroneously concluded that the government's Filter Team was a discovery protocol rather than a safeguard, used in the government's discretion, to execute search warrants without implicating constitutional concerns. Second, though the Order directed that the Filter Team review 630,000 emails and documents for privilege prior to their production in discovery, the Order lacked any legal analysis regarding whether any privilege exists; by whom it is held; and whether any privilege survives the government's seizure of the electronic media and any subsequent production in discovery and/or

---

[1]  Both Fed. R. Crim. P. 59(a) and Mag. L.R. 2(b) state that objections must be filed within 14 days of the order or by another date set by the Court.  At the request of the government, this Court ruled that objections to the Order should be filed by January 6, 2016.  See Doc. No. 476.

NECC's bankruptcy.  Third, the Order failed to address what steps any potential privilege holder had taken to preserve any privilege, and if a privilege does still exist, why an order pursuant to Federal Rule of Evidence 502(d) would not protect it.   In light of these deficiencies, the government submits the Order was clearly erroneous and contrary to law for several reasons, and therefore, should be overturned.

## BACKGROUND

### The Government's Search Warrants

As the Court is aware, this criminal case arose from the nationwide outbreak of fungal meningitis in the fall of 2012 traced to epidural steroid injections of methylprednisolone acetate ("MPA") compounded by New England Compounding Pharmacy, Inc., doing business as New England Compounding Center ("NECC").   During the outbreak, the U.S. Centers for Disease Control and Prevention ("CDC") and the Food and Drug Administration ("FDA") confirmed fungal infection in patients treated with MPA injections sold by NECC, and the presence of mold in multiple unopened vials of three different lots of MPA made by NECC.  By October 2013, the CDC identified approximately 751 patients, living in twenty states, with fungal infections after receiving MPA injections compounded at NECC, of which 64 died.  The criminal investigation revealed that the number of victims continued to rise.

In October 2012, the government executed two criminal search warrants at NECC. Pursuant to those warrants, the government seized a large volume of electronic media ("the original electronic media").  In its discretion, the government identified which pieces, as well as what parts of those pieces, of the electronic media were most relevant to the criminal investigation, and therefore, would be examined ("the processed electronic media").  To further conduct the search, the government chose to utilize search terms to identify potentially relevant

documents from the processed electronic media.  To avoid any privileged material that could implicate constitutional concerns, the government subsequently ran potentially privileged search terms and date restrictions against the subset of documents that hit on relevant search terms to identify documents that could potentially contain privileged communications.  The use of relevant search terms and potentially privileged search terms were not part of the government's discovery protocol.  The government did not run these searches to locate potentially discoverable documents, but rather ran them, in its discretion, in executing the search warrants.  All materials that hit on the relevant search terms but <u>not</u> the potentially privileged search terms and date restrictions were provided to the investigative team for its review (the "investigative set"); all materials that hit on the relevant search terms <u>and</u> the potentially privileged search terms and date restrictions were provided to the Filter Team for its review (the "potentially privileged set").

The initial investigative set comprised approximately 1.1 million e-mails and documents, all of which were provided to the defendants in the government's first two discovery productions on January 14, 2015, and February 11, 2015.  In addition, since January 26, 2015, the government has offered on multiple occasions to provide the defendants in discovery with copies of the original electronic media, in whole or in part, for their review.  Unlike in the case of disclosure to the investigative team, no constitutional concerns could be raised by the defendants viewing potentially privileged materials.  To date, no defendants have requested any portion of the original electronic media.

The potentially privileged set, which was provided to the Filter Team for its review, initially numbered approximately 713,000 e-mails and documents.  In its discretion, the Filter Team did not attempt to review all 713,000 e-mails and documents.  Instead, at the request of the investigative team, the Filter Team prioritized its review of material from certain custodians and

time-periods.  During the course of the investigation, the Filter Team has made approximately six productions to the investigative team of cleared material, totaling approximately 81,000 e-mails and documents.  All of the cleared material was provided to the defendants in the government's subsequent discovery productions.  The Filter Team anticipates making an additional production of 89,000 e-mails and documents to the investigative team in the near future.  The government intends to produce these additional cleared e-mails and documents to the defendants upon receipt.  Following this upcoming production, approximately 543,000 e-mails and documents will remain in the potentially privileged set.

Chief Magistrate Judge Boal's November Order

On November, 10, 2015, Chief Magistrate Judge Boal issued an order (Doc. No. 389) [hereinafter, "the November Order"] requiring the government to "complete its taint review of potentially privileged emails no later than December 10, 2015."  At that time, there were approximately 650,000 e-mails and documents remaining in the potentially privileged set.  The government interpreted the November Order to mean any e-mails not cleared by the Filter Team by December 10, 2015, would be excluded from use at trial by the government.  The government did not interpret the November Order as requiring the Filter Team to review all 650,000 e-mails and documents in 20 business days, which would require review of approximately 32,500 e-mails (plus attachments) and documents a day, which would not have been possible.

On November 16, 2015, the government sent the defendants a letter answering their several questions regarding the electronic media and offered to provide the defendants, at their option, with either (i) the original electronic media (in whole or in part, as the government had offered to make available since January 2015), (ii) the processed electronic media, or (iii) the entire potentially privileged set that had not yet been reviewed by the Filter Team.  As stated

above, unlike in the case of disclosure to the investigative team, no constitutional concerns would be raised by disclosing potentially privileged materials to the defendants.  To date, no defendants have requested any of the three options offered by the government.[2]

### The Government's Claw-Back Proposal

At a status conference on December 3, 2015, Chief Magistrate Judge Boal informed the government that the November Order, which was indeed compelling the government to reallocate its internal resources to review all 650,000 e-mails and documents for the defendants in 20 business days.  Such an understanding was obviously inconsistent with the government's November 16, 2015, offer, made six days after the November Order, to provide the defendants with the entire potentially privileged set.  The government would not have made such an offer if it understood the court had ordered the Filter Team to review all of the documents.  The government notified Chief Magistrate Judge Boal that it objected to such an interpretation of the November Order because (i) it interfered with the discretionary manner in which the government executed, and was entitled to execute, its search warrants; (ii) it was factually impossible for the Filter Team to review that many documents in such a short time-period; and (iii) it exceeded the court's authority by requiring the government to allocate additional resources to conduct the review and further investigate.  See Status Rep. (Doc. No. 453) at 3 (Dec. 4, 2015).

Following the government's notification, Chief Magistrate Judge Boal issued a further order in which she "encourage[d] the parties to attempt to resolve the underlying discovery dispute because at this point any such resolution may well be the most efficient way to resolve the issue."  Doc. No. 455 (Dec. 4, 2015).  On December 10, 2015, the government met with a

---

[2]  Some of the defendants filed a motion requesting that the court order the government to allow a "neutral expert" to run additional searches for the defense on the government's database of processed electronic media or have a government agent run the searches for the defense but not share them with the prosecution team.  See Doc. No. 492. While the government has offered to provide the defendants with the processed electronic media so they can run their own searches, it has refused to conduct searches on the defendants' behalf and will oppose the motion.

subset of counsel for the defendants and proposed an alternative approach to handle disclosure of the potentially privileged set [hereinafter "the claw-back proposal"].   Specifically, the government suggested that the most efficient way to proceed was to have the Filter Team provide the entire potentially privileged set to the defendants and to jointly request that Chief Magistrate Judge Boal enter an order with a claw-back provision pursuant to Federal Rule of Evidence 502(d).   See Joint Status Rep. (Doc. No. 467) at 3-4 (Dec. 11, 2015).   Under that proposal, while the defendants would have access to the potentially privileged set, the investigative team would not, in order to avoid any constitutional concerns.   The government's claw-back proposal included a requirement that any counsel seeking to use a potentially privileged document in a public court filing or at trial first consult the privilege holder and allow the privilege holder an opportunity to exercise the claw-back provision.   Id.   The government also indicated that to the extent any privilege existed, it belonged to the now-bankrupt NECC, and therefore was held by the post-confirmation officer, not the criminal defendants.   Id. at 2.

The defendants rejected the claw-back proposal, but offered no alternative other than for the Filter Team to review all remaining e-mails and documents in the potentially privileged set. The defendants also offered no cognizable explanation for why the claw-back proposal was infeasible.

The Order

Following the joint status report that outlined the parties' respective positions, Chief Magistrate Judge Boal issued the Order.   In her six-page Order, Chief Magistrate Judge Boal required the government "to finish the taint team review of all potentially privileged emails no later than January 15, 2016."[3]   Order at 6.   In reaching this conclusion, however, the Order relied

---

[3]   At the time of the Order, there were approximately 630,000 e-mails and documents remaining in the potentially privileged set.

on facts that were incorrect.  Moreover, the Order once again only provided approximately 20 business days for the government to complete this task despite the government's earlier statement that completing the review in such a short time-period was factually impossible for the Filter Team.  The Order contained no citations to any federal or local rules, or case law in support of its conclusions.  Further, the Order did not analyze the central issues of the discovery dispute:  whether a privilege exists; by whom it is held; and whether the privilege survives the government's seizure of the electronic media and any subsequent production of the media in discovery.  Finally, the Order failed to address what steps a privilege holder had taken to preserve any privilege, and if a privilege does still exist, why an order pursuant to Rule 502(d) and the government's claw-back proposal would not protect it.  Accordingly, the government submits that Chief Magistrate Judge Boal's Order was clearly erroneous and contrary to law, and therefore should be reversed by this Court.  See 28 U.S.C. § 636(b)(1)(A) (authorizing a district judge to reconsider any matter in which "the magistrate judge's order is clearly erroneous or contrary to law"); United States v. Garcia, 983 F.2d 1160, 1163 (1st Cir. 1993) ("A magistrate's discovery order may be set aside where the order is clearly erroneous or contrary to law.").

## LEGAL ANALYSIS

1. The Government's Use of Potentially Privileged Search Terms and the Filter Team Was Not a "Longstanding Discovery Protocol," But the Manner in Which the Government Executed Search Warrants Without Implicating Constitutional Concerns.

As an initial matter, the Order stated that the use of the potentially privileged search terms and the Filter Team to cull out privileged communications was part of a "longstanding discovery protocol" used by the government in this case that it has now attempted to abandon. Order at 2.  This is factually incorrect.  The decision to apply potentially privileged search terms and use a Filter Team as part of the government's execution of the search warrants was made in its discretion in the Fall of 2012, more than two years before an indictment and any discovery

was provided in this case.  It simply was not a tool to obtain and disseminate discoverable information to the charged defendants.

Further, the manner in which the government chose to execute the warrants was a matter for its discretion.  As this Court is aware, "[i]t is 'generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant.'"  United States v. Tsarnaev, 2014 WL 5308087, at *11 (D. Mass.  Oct. 17, 2014) (quoting Dalia v. United States, 441 U.S. 238, 239 (1979)).  As the First Circuit has noted, "[t]he warrant process is primarily concerned with identifying *what* may be searched or seized – not how…." United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999) (emphasis in original); see also Dalia, 441 U.S. at 258 (holding that "[i]t would extend the Warrant Clause to the extreme to require that…the court must set forth precisely the procedures to be followed by the executing officers"); United States v. Burgess, 576 F.3d 1078, 1094 (10th Cir. 2009) ("[I]t is folly for a search warrant to attempt to structure the mechanics of the search and a warrant imposing such limits would unduly restrict legitimate search objectives.").

While the government may exercise this discretion in executing a warrant, courts have found serious constitutional concerns are implicated when government agents review privileged attorney-client communications as part of their criminal investigation.  As one district court has explained:

> One of the principal purposes of the attorney-client privilege is to promote the free and open exchange between the attorney and client, and substantial questions of fundamental fairness are raised where, in connection with a criminal prosecution, the government invades the privilege.  It matters little whether the intrusion occurred prior to the initiation of formal adversary proceedings because the right to a fair trial could be crippled by the government interference with the attorney-client privilege long before the formal commencement of a criminal proceeding.

United States v. Neill, 952 F. Supp. 834, 839 (D.D.C. 1997) (emphasis added).  See also United States v. Horn, 29 F.3d 754, 758 (1st Cir. 1994) (finding a prosecutor's review of attorney-client work product "abridged [the defendants'] Fifth Amendment right to due process and their Sixth Amendment right to effective assistance of counsel"); United States v. Irwin, 612 F.2d 1182, 1185 (9th Cir. 1980) ("It is clear that government interference with a defendant's relationship with his attorney may render counsel's assistance so ineffective as to violate his Sixth Amendment right to counsel and his Fifth Amendment right to due process of law."); In re Terkeltoub, 256 F. Supp. 683, 685 (S.D.N.Y. 1966) ("The prosecution's secret intrusion offends both the Fifth and Sixth Amendments.").

Courts have noted, however, that "[w]here government agents acquire privileged information, but do not communicate that information to the prosecutors, there is no Sixth Amendment violation."  Neill, 952 F. Supp. at 840; United States v. Mastroianni, 749 F.2d 900, 908 (1st Cir. 1984) (affirming no Sixth Amendment violation where the defendant failed to show that any prejudice resulted).  Thus, the government can rebut any allegation of prejudice "by showing the existence of suitable safeguards."  Neill, 952 F. Supp. at 840.

Applying these well-settled principles to this case, the government respectfully submits that Chief Magistrate Judge Boal's characterization of the Filter Team and the privilege review as a "longstanding discovery protocol" was clearly erroneous.  In the fall of 2012, the criminal investigation was commencing and it was unclear at that time who, if anyone, would be criminally prosecuted.  It was equally unclear whether NECC as an entity, which at the time still existed, would be charged as well.  Thus, in executing the search warrants on the original electronic media, the government, in its discretion, elected which pieces of electronic media to search, and then how to conduct the search.  The government further established "suitable

safeguards," including the use of potentially privileged terms and the Filter Team, to prevent privileged communications from being used in the criminal investigation. These safeguards had nothing to do with the government's discovery obligations that would not arise until two years later.

Moreover, how the Filter Team conducted its privilege review – how it prioritized which part of the potentially privileged set to review, and whether to review only selected portions or the entirety of the potentially privileged set – falls squarely within the discretion of the government. As such, Chief Magistrate Judge Boal was without authority to dictate how the search and privilege review should be conducted. See e.g., Jafree v. Barber, 689 F.2d 640, 643 (7th Cir. 1982) (holding that a court cannot compel federal officials to perform a discretionary act); Ross v. United States Attorney's Office, 511 F.2d 524, 525 (9th Cir. 1975) (holding that "[t]he well-settled principle that mandamus does not lie to compel a United States Attorney to perform a discretionary act"); O'Connor v. Nevada, 507 F. Supp. 546, 549 (D. Nev. 1981) ("It has been held that federal district courts cannot order a United States Attorney to conduct an investigation or initiate a prosecution because it would violate the doctrine of separation of powers.").[4] Accordingly, the Order was not only factually erroneous, but also contrary to law.

Following the Indictment in this case, the government more than met its discovery obligations in January 2015 by disclosing to the defendants the entire investigative set – all 1.1 million e-mails and documents upon which the investigative team relied in returning the

---

[4] In the Order, Chief Magistrate Judge Boal wrote "[t]hose cases are plainly distinguishable," because they involved the initiation of criminal investigations. Order at 4 n.3. But these cases cannot be read to be limited solely to that context. All of these cases discuss a court's authority to order federal officials to perform discretionary as opposed to ministerial acts. See Panama Canal Co. v. Grace Line Inc., 356 U.S. 309, 317 (1958) (holding that a court's authority over federal officials is limited to "situations where ministerial duties of a nondiscretionary nature are involved"). How the government executes a search warrant or the Filter Team conducts a privilege review is substantially more than a ministerial act subject to the Chief Magistrate Judge's authority. The Order failed to cite any case in support of a contrary position.

Indictment – as well as offering to provide any part of the original electronic media to the defendants that they requested.   While the original electronic media contained privileged communications, unlike if disclosure were made to the investigative team, no constitutional concerns would be implicated by providing it to the defendants in discovery.[5]   When the defendants first raised the issue of the potentially privileged set, the government responded by offering to produce the entire potentially privileged set that had not yet been reviewed by the Filter Team to the defendants.   Thus, Chief Magistrate Judge Boal's conclusion in the Order that the government had not complied with its discovery obligations was clearly erroneous, and it should be overturned.

   2.   To the Extent that Privileged Communications Exist, the Privilege is Held by the Post-Confirmation Officer, Not the Defendants in This Case, and Disclosure in Discovery Does Not Waive the Privilege.

   The Order failed to reach a conclusion as to whether a privilege exists, by whom it is held, and whether the privilege survives the government's seizure of the electronic media and subsequent production in discovery.   Specifically, the Order stated, "[t]he Court takes no position regarding whether the privilege is held by NECC's post-confirmation officer or the control group for NECC and whether disclosure to the control group would waive the privilege."   Order at 5 n.8.   However, this is the central legal issue underlying this discovery dispute.   The Order also stated, "based on the information provided to the Court to date, it appears that the privilege would be waived if such material were produced to all defendants."   Id.   But the Order did not explain what "information provided to the Court to date" supported the Chief Magistrate Judge's

---

[5] Chief Magistrate Judge Boal wrote in the Order that the government "has offered no reason to believe [the privilege] concern no longer exists."   Order at 5.   However, the privilege concern had to do with disclosure of privileged communications to the investigative team, not to the defendants.   Neither the Order, nor the defendants, have cited any authority for the proposition that disclosure of potentially privileged communications to the defendants in criminal discovery implicates constitutional concerns of fundamental fairness, due process, or the defendants' right to a fair trial.

conclusion that disclosure of the privileged communications in discovery would constitute a waiver.  Accordingly, the Order was clearly erroneous and contrary to law on this point as well. It should be overturned.

A.  The Privilege is Held By NECC's Post-Confirmation Officer, Not the Defendants.

None of the fourteen criminal defendants holds a privilege with respect to communications in the potentially privileged set.  Though Chief Magistrate Judge Boal speculated at the December 3, 2015, status conference that the privilege may be held by the control group for NECC, this is legally incorrect.  While the control group may have held the privilege at the time of the search warrants in October 2012 before NECC filed for bankruptcy, it is well settled that the privilege transferred to the bankruptcy trustee upon his appointment in February 2013.  See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 351-52 (1985) (holding that the trustee of a corporation in bankruptcy holds the corporation's privilege). The Supreme Court has explained that in bankruptcy, "the trustee plays the role most closely analogous to that of a solvent corporation's management," id. at 352, and therefore, the trustee, rather than the former directors and officers, controls the corporation's privilege even with respect to pre-bankruptcy communications.  "Displaced managers may not assert the privilege over the wishes of the current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties."[6]  Id. at 349.  The Supreme Court explained that it is appropriate for the Trustee to hold the privilege because:

---

[6]    Three of the defendants, Gregory Conigliaro, Carla Conigliaro, and Douglas Conigliaro, asserted to Chief Magistrate Judge Boal that they held the now-bankrupt corporation's privilege as members of the former control group.  See Doc. No. 464 at 2.  Their argument is directly contravened by the Supreme Court's holding in Weintraub.  It is unclear what weight, if any, Chief Magistrate Judge Boal gave to their legally incorrect position in reaching her conclusions in the Order.

   To the extent that any of the defendants might claim an individual privilege in the company e-mails and documents, this argument would be equally unavailing.  NECC's Internet and computer policy stated, "[t]he company may examine, for whatever reason, an employee's Internet use, including all email with or without notice or an employee's consent.  Accordingly, all employees should not expect that their use of the Company's Internet

[i]n seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors. It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct.

Id. at 353-54.

In December 2012, NECC filed for bankruptcy. See In re: New England Compounding Pharmacy Inc., Case No. 12-19882-HJB (Doc. No. 1) (Bankr. D. Mass. 2012). On February 1, 2013, a Chapter 11 trustee was appointed for NECC. See id. Doc. No. 109. The law is clear that at such time, the privilege transferred from the NECC control group to the trustee. The bankruptcy plan was confirmed by Judge Boroff on May 20, 2015.[7] See id. Doc. No. 1355. To the extent that a privilege still exists, it is held by the post-confirmation officer.

In light of the Supreme Court's holding in Weintraub, it is clear that the Order erred by suggesting the defendants could still potentially assert a privilege on behalf of the bankrupt

---

access, email or resources will be private." (FDA_P00047879). Thus, any communications between NECC employees and their attorneys would not be protected privileged communications. See e.g., Hanson v. First National Bank, 2011 WL 5201430, at *6 (S.D. W. Va. Oct. 31, 2011) (holding employee communications on company system are not protected when employee had "no objectively reasonable expectation of privacy or confidentiality"). Indeed, the Order does not address an individual privilege at all.

[7]  It is unsettled what effect the confirmation of the bankruptcy plan has on the Trustee's ability to assert the privilege on behalf of the corporation. Compare In re Hechinger Investment Co., 285 B.R. 601, 613 (D. Del. 2002) (holding that a bankruptcy trustee continues to hold the entity's privilege post-confirmation) with Lewis v. United States, 2004 WL 3203121, at *4 (W.D. Tenn. Dec. 7, 2004) (holding that a post-bankruptcy corporation is "dead" where it has "no assets, liabilities, directors, shareholders, or employees" and its privilege is extinguished). In finding the privilege extinguishes with the corporation, courts have explained that "[t]his rule is consistent with the principle that the attorney-client privilege should be given the narrowest interpretation consistent with its purpose. No real purpose would be served by continuing the privilege after operations cease, as the corporation would no longer have any goodwill or reputation to maintain." Gilliland v. Geramita, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006). Indeed, the rationale expressed in Weintraub in transferring the privilege to the trustee – to uncover insider fraud – ceases to exist in a post-confirmation setting.

NECC corporate entity.   None of the criminal defendants holds a privilege with respect to communications in the potentially privileged set.   This is a further reason that the Order should be overturned.

      B.   <u>Any Privilege Was Not Waived By the Government's Seizure of the Electronic Media Nor Any Subsequent Disclosure In Discovery to the Criminal Defendants.</u>

To the extent that a privilege still exists, it was not waived by the government's seizure of the original electronic media in October 2012.   As the Tenth Circuit has stated, "[w]hen material is seized pursuant to a search warrant, production is not voluntary."   <u>United States v. Ary</u>, 518 F.3d 775, 783 (10th Cir. 2008).   Thus, involuntary production does not waive the privilege.   <u>See also</u> <u>United States v. de la Jara</u>, 973 F.2d 746, 749 (9th Cir. 1992) ("[I]t is clear that the privilege was not lost through the government's discovery of the [privileged material] in the course of executing its search warrants.").   Any subsequent production of the privileged material in discovery to the defendants would still be involuntary, and therefore, not constitute a waiver.

In the Order, Chief Magistrate Judge Boal wrote, "[t]he government has not satisfactorily addressed the Court's concerns regarding a potential waiver of any privilege by disclosing privileged materials to all defendants."   Order at 5.   However, the Chief Magistrate Judge did not explain what waiver concerns remained.   Moreover, the Order did not cite any case or rule for the proposition that involuntary production of privileged material waives a privilege. Accordingly, the Order was clearly erroneous and contrary to law and should be overturned.

      3.   <u>Though the Post-Confirmation Officer Has Not Taken Steps to Preserve NECC's Privilege, the Government's Claw-Back Proposal Would Preserve Any Privilege that Still Exists and Efficiently Resolve this Discovery Dispute.</u>

Lastly, the Order provided no discussion as to whether the post-confirmation officer has taken steps to preserve a privilege on behalf of the now-bankrupt NECC, or whether that privilege has been waived.   Moreover, to the extent that Chief Magistrate Judge Boal concluded

that a privilege still existed, the Order did not address why an order pursuant to Federal Rule of Evidence 502(d) and the government's claw-back proposal would not protect that privilege and resolve this discovery dispute efficiently.

A. <u>The Post-Confirmation Officer Has Not Taken Steps to Preserve NECC's Privilege.</u>

Though Chief Magistrate Judge Boal concluded that a privilege still existed, the Order was silent as to what steps the post-confirmation officer had taken to preserve any privilege on behalf of the now-bankrupt NECC entity in the past three years. Courts have held that "in the case of an involuntary disclosure, the party asserting the work-product doctrine or attorney-client privilege must pursue all reasonable means to preserve the confidentiality of the material." <u>Ary</u>, 518 F.3d at 784; <u>see also</u> <u>de la Jara</u>, 973 F.2d at 749 ("When the disclosure is involuntary, we will find the privilege preserved if the privilege holder has made efforts reasonably designed to protect and preserve the privilege."); <u>Bowles v. Nat'l Ass'n of Home Builders</u>, 224 F.R.D. 246, 253 (D.D.C. 2004) ("Courts have consistently held that, in cases of involuntary disclosure, waiver occurs only when the holder has failed to take reasonable steps to reclaim the protected material.").

In this case, the original electronic media was seized pursuant to search warrants in October 2012. As stated above, in February 2013, the privilege transferred from the NECC control group to the bankruptcy trustee. Since that date, *nearly three years ago*, the NECC trustee never contacted the government, nor the Court, regarding any potentially privileged materials contained in the seized electronic media. Accordingly, the Court should find any potential corporate privilege held by the now-bankrupt NECC was waived with respect to this material. <u>See</u> <u>Ary</u>, 518 F.3d at 785 (affirming district court's holding that waiting six weeks to assert privilege constituted a waiver); <u>de la Jara</u>, 973 F.2d at 749 (holding that defendant waived

the privilege where he did not attempt to recover the privileged material for six months); <u>In re Grand Jury</u>, 138 F.3d 978, 983 (3d Cir. 1998) (affirming district court's holding that waiting four months to seek judicial redress waived the privilege).

In December 2015, when this discovery issue arose, the government contacted counsel for the post-confirmation officer who indicated the post-confirmation officer was unaware of the issue. Nevertheless, counsel for the post-confirmation officer wrote, "the Post Confirmation Officer f/k/a the Trustee has consistently maintained privilege. Given what we know at this point he intends to continue to do so." E-mail from M. Gottfried to AUSA Strachan (Dec. 11, 2015). There has been no follow up since that date, either with the government or the Court. The government respectfully submits that such a generalized statement is insufficient to maintain and safeguard the bankrupt entity's privilege with respect to this material, which was seized over three years ago. <u>See</u> <u>e.g.</u>, <u>In re Grand Jury</u>, 138 F.3d at 982 (holding that "[i]n the case of such an involuntary disclosure, a reasonable person would not only inform his or her adversary of the breach of the privilege, but also would seek a judicial determination of the controversy"); <u>de la Jara</u>, 973 F.2d at 750 ("[W]e will deem the privilege to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter."). Moreover, the interest in protecting a privilege of a bankrupt entity is severely diminished following confirmation. <u>See</u> <u>supra</u> note 7 (noting that the rationale identified in <u>Weintraub</u> in transferring the privilege to the trustee – to uncover insider fraud – ceases to exist in a post-confirmation setting). Accordingly, given the post-confirmation officer's failure to take reasonable steps to protect the privilege and the diminished rationale in upholding the privilege in a post-confirmation setting, the Order should have concluded that any claim of privilege on behalf of the now-bankrupt NECC was waived.

Because it lacked any analysis at all of whether the privilege holder has taken steps to preserve the privilege, or even whether the privilege remains post-confirmation, the Order's conclusion that a privilege remains was clearly erroneous and contrary to law.  Accordingly, it should be overturned.

    B.  <u>To the Extent Any Privilege Remains, a Rule 502(d) Order Would Preserve It and Efficiently Resolve this Discovery Dispute.</u>

Finally, to the extent Chief Magistrate Judge Boal asserted a privilege still exists, and had concerns about the disclosure of potentially privileged material in discovery, the Order did not address why Federal Rule of Evidence 502(d) and the government's claw-back proposal would not alleviate those concerns while providing an efficient resolution to the discovery dispute.

Rule 502(d) of the Federal Rules of Evidence states that "[a] federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court – in which event the disclosure is also not a waiver in any other federal or state proceeding."  Fed. R. Evid. 502(d).  The rule, which was enacted in 2008, was meant to "resolve[] some longstanding disputes in the courts about the effect of certain disclosures of communications or information protected by the attorney-client privilege or as work product – specifically those disputes involving inadvertent disclosure and subject matter waiver."  Fed. R. Evid. 502 advisory committee's note.  The advisory notes explain that the rule is particularly directed to "cases involving electronic discovery," and "contemplates enforcement of 'claw-back' and 'quick peek' arrangements as a way to avoid the excessive costs of pre-production review for privilege and work product."  <u>Id.</u>  Courts have issued Rule 502(d) orders with claw-back provisions in cases involving significant amounts of electronically stored information ("ESI") that contain potentially privileged material.  <u>See S2 Automation LLC v. Micron Tech., Inc.</u>, 2012 WL 3150387, at *4 (D.N.M. Jul. 23, 2012) (holding that "clawback orders are staples

of modern complex commercial litigation"); <u>Adair v. EQT Prod. Co.</u>, 2012 WL 2526982, at *4 (W.D. Va.  Jun. 29, 2012) (holding that "in the world of ESI, new perspectives and approaches are needed to complete discovery in an efficient and reasonable manner"); <u>Rajala v. McGuire Woods LLP</u>, 2010 WL 2949582, at *6 (D. Kan. Jul. 22, 2010) (holding that case involving "an extensive amount of ESI, including a large number of e-mail messages" would be "precisely the type of case that would benefit from a clawback provision.").  "Such a [claw-back] provision will permit the parties to conduct and respond to discovery in an expeditious manner, without the need for time-consuming and costly pre-production privilege reviews, and at the same time preserve the parties' right to assert the attorney-client privilege or work product immunity." <u>Rajala,</u> 2010 WL 2949582, at *6.  Indeed, such claw-back provisions are typical in complex white-collar criminal investigations such as this one.

In this case, the government submits that its claw-back proposal remains the most efficient manner to resolve this discovery dispute.  In its claw-back proposal, the Filter Team would provide the entire potentially privileged set to the defendants and the Court would enter an order with a claw-back provision pursuant to Rule 502(d).  While the defendants would have access to the potentially privileged set, the investigative team would not unless the documents were cleared by the Filter Team, in order to avoid any constitutional concerns.

In the Order, Chief Magistrate Judge Boal did not address the claw-back proposal beyond a cursory dismissal that it "shifts to the defendants an enormous discovery undertaking" and depletes funds available for fungal meningitis victims.  Order at 5 & n.9.  This argument is erroneous.  Under the government's claw-back proposal, neither the defendants, nor the post-confirmation officer, would be saddled with "an enormous discovery undertaking," nor would the victims' recoveries be depleted.  Rather, it would simply mean that the defendants would

have access to documents the investigative team would not.  The defendants would not be under

any obligation to review the documents for privilege or any other "discovery undertaking."

Instead, any defendant seeking to use a potentially privileged document in a public court filing or

at trial would first allow the post-confirmation officer an opportunity to exercise the claw-back

provision.  Thus, any privilege review would be limited solely to those documents to be used in

litigation or trial that raise a potential corporate privilege concern.  The 502(d) order would

ensure that no privilege of the bankrupt NECC (to the extent one remains) would be waived in

the disclosure of the potentially privileged set to the defendants.  The government submits that its

claw-back proposal is consistent with the case law and Rule 502(d), the government's discovery

obligations, and this Court's authority.

**<u>CONCLUSION</u>**

For all of the above reasons, the United States respectfully requests that this Court

overturn Chief Magistrate Judge Boal's Order.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY

By:   /s/ George P. Varghese
      AMANDA P.M. STRACHAN
      BBO # 641108
      GEORGE P. VARGHESE
      Assistant United States Attorneys
      John J. Moakley United States Courthouse
      One Courthouse Way, Suite 9200
      Boston, Massachusetts 02210
      (617) 748-3100
      amanda.strachan@usdoj.gov
      george.varghese@usdoj.gov

Dated:  January 6, 2016

Certificate of Service

I hereby certify that the foregoing documents filed through the ECF system will be sent electronically to counsel for the defendants, who are registered participants as identified on the Notice of Electronic Filing (NEF).


By:     /s/ George P. Varghese
        GEORGE P. VARGHESE
        Assistant United States Attorney


Dated:  January 6, 2016