UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | Court No.: 14-cr-10363-RGS-3-9, 11-12 |
| v. | ) | |
| | ) | |
| BARRY CADDEN, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

**DEFENDANTS' MOTION *IN LIMINE* REGARDING
OBJECTIONABLE TRIAL PRACTICES BY THE GOVERNMENT**

Review of the transcripts from the trials of Barry Cadden ("Cadden") and Glenn Chin

("G. Chin") reveals recurring categories of objectionable trial practices by the Government.

Through this motion, Defendants Gene Svirskiy, Christopher Leary, Joseph Evanosky, Sharon

Carter, Alla Stepanets, Gregory Conigliaro, Kathy Chin, and Michelle Thomas ("Defendants")

seek to alert the Court regarding these practices and register the Defendants' objections to them.

Defendants also respectfully request that the Court issue an order precluding the Government

from engaging in such practices during Trial 3.

The Government's objectionable practices have included the following:

**1.   Appeals to Passion and Prejudice**

In its opening statements, closing arguments, and rebuttals, the Government repeatedly

has used language that improperly appeals to jurors' passions and prejudices.  Examples include:

a.   Likening the second-degree murder predicate acts with which Glenn Chin was
charged to smothering a baby to death with a blanket:

> "Second-degree murder. A person has a crying baby, just wants the baby to stop
> crying. Puts a blanket over the baby's face. The intention was to stop the crying.
> The result, second-degree murder. That's what Mr. Chin did in this case, just like
> those." (Chin Tr. 3:50).

b. Likening Barry Cadden's conduct to placing a loaded gun against someone's head and pulling the trigger:

> "Mr. Cadden was playing a game of Russian roulette. He's taking a bullet, he was putting it in the cylinder of the gun, he was flipping it and pulling the trigger . . . He just kept spinning the cylinder and pulling the trigger and waited." (Cadden Tr. 46:127)

c. Characterizing the fungal meningitis that resulted from the injection of contaminated methylprednisolone acetate as "worse" than Ebola, a dreaded and highly contagious hemorrhagic virus, because it "happened . . . on our soil":

> "Dr. Park told you that in his 15 years at the CDC working on outbreaks, the only thing that compared in his mind was Ebola, but that this seemed worse because it happened in this country, on our soil, and it was entirely preventable." (Cadden Tr. 46:57).

d. Urging jurors to imagine their loved ones in the shoes of the victims who received contaminated steroid shots:

> "And if all of that isn't enough, then I ask you to just ask yourself: Would you allow a loved one to have this lot injected into their bodies?" (Cadden Tr. 46:52-53)

e. Telegraphing their personal opinions concerning the defendants and doing so in inflammatory terms:

> "It is hard to find the words for a pharmacist who makes and mislabels a five-year-expired chemo drug for kids with cancer. 'Depraved' comes to mind…. That's what you do when you don't care about patient lives, when you don't care if kids' chemo works. It's a haunting thought…." Chin Tr. 24:28-30.

Such appeals to passion and prejudice are improper and should be precluded from Trial 3.


2. **Generalized Questions Untied to Specific Individuals or Timeframes**

The Government repeatedly seeks to elicit generalized, non-specific testimony from witnesses concerning alleged occurrences at NECC, which the Government makes no effort to link to particular people or to particular time periods. In its arguments to the jury, the Government has made equally unspecific assertions regarding the actions of "they," "them," and "NECC."

The Court has commented to the Government about this issue, observing that it is important to know the "when" and the "who," rather than simply attribute statements (or conduct) to unidentified people at unspecified times.  (Cadden Tr. 15:156).

Examples include:

a.   Asking open-ended questions untethered to particular actors or time frames:

> Q What was your -- was there ever a discussion within the clean room about whether or not there were prescriptions for those drugs?
> MR. SINGAL: Objection. Foundation.
> THE COURT: Who? When?  (Cadden Tr. 15:155)

b.   Arguing to the jury about the actions of "they" and "them":

> Let me ask you this: Have you ever stopped to think about all of the things that NECC did wrong:
>
> They didn't sterilize the methylpred for a great amount of time.
> They didn't verify the autoclave sterilization process.
> They didn't use biological indicators.
> They tested from the batch instead of doing end-product testing.
> They didn't test enough samples of the drug.
> They didn't wait for test results to come back before sending out the drug.
> They shipped the drugs without prescriptions.
> They shipped drugs with expired ingredients . . .
>
> [Followed by 10 additional "they" accusations]  (Cadden Tr. 46:7-8)

Such generalized questioning (and argument) should be precluded.  "They" and "them" are not on trial, and Defendants' guilt cannot be predicated on the actions, conduct or statements of unidentified people at unspecified times.

### 3. <u>Lack of Foundation, Personal Knowledge</u>

The Government repeatedly has asked witnesses about alleged occurrences or "practices" without laying a foundation sufficient to establish that the witness possesses firsthand personal knowledge regarding the subject about which he or she has been asked:

> Q Were other pharmacists in the clean room aware of the practice of the botching lots?
> MR. SINGAL: Objection.
> THE COURT: Sustained.  (Cadden Tr. 15:120).

Employees at NECC worked at specific workstations on specific tasks.  For example, a pharmacy tech such as Joseph Connolly or Owen Finnegan might spend a substantial part of his work day sitting at a designated clean room hood, with limited opportunity to observe what was happening elsewhere.

No witness should be asked – or be permitted to answer – broad questions about occurrences or "practices" allegedly rampant at NECC absent the laying of a foundation that the witness possesses sufficient firsthand knowledge to answer the question.  Testimony should be predicated on factual events that a witness observed, not on speculation or what a witness "heard" being "talked about" by "others."  The Government has not hewed to this evidentiary line, as demonstrated by the following passage from its direct examination of Owen Finnegan at the *Cadden* trial:

> Q . . . was there ever any occasion when lot names were changed to extend the beyond use date?
> A Yes.
> Q Tell us about that. When did that occur?
> A I can't recall a specific instance that it happened. I just know there was talk about it. Joe had mentioned it.
> MR. SINGAL: I move to strike, your Honor.
> THE COURT: Sustained.  (Cadden Tr. 15:137)

**4.  <u>Requests for Witness Narratives</u>**

The Government also frequently seeks to elicit narrative answers from its witnesses,

through questions that ask witnesses to "Tell us about that" and are devoid of specificity

regarding actors, time frames, or anything else:

> Q Were you ever asked to place the labels on the Nalgene container?
> A Yes.
> Q Tell us about that.
> MR. SINGAL: I object.
> THE COURT: When? By whom?  (Cadden Tr. 15:142).
>
> Q. Did you have any concerns about Ms. Robinson and her ability to perform her
> duties?   . . . . [Objection colloquy omitted]
> A. Many concerns.
> Q. Tell us about them.
> A. Annette's whole purpose for being there, from my vantage point, was to gossip
> and complain about other people in the inputting room. I don't know that she took
> her job very seriously. There were times me and Joe joked that she had to have
> been a relative of Barry's to even get a job there, so...
> MR. SINGAL: Move to strike.
> THE COURT: That is sustained. (Cadden Tr. 14:136).

The Government's "Tell us about that" approach to questioning deprives defense counsel

of the ability to object to – and the Court of the ability to head off – improper testimony before it

comes out, including expressions of personal opinion, inadmissible hearsay, descriptions of

alleged occurrences unconnected to the defendants and charges at issue, and, potentially,

evidence that the Court has precluded from the trial.  The risk of irremediable prejudice will be

particularly acute in Trial 3, given the potential for witnesses to make – in the midst of narrative

answers elicited by the Government – some mention of patient illness or harm – testimony that

several of these same witnesses gave in the *Cadden* and *G. Chin* trials, but that the Court has

ordered excluded from Trial 3.

**5.  Witness Expressions of Opinions, Beliefs, and Impressions**

In conjunction with its use of narrative questioning, the Government often has elicited

testimony about a witness's personal opinions, beliefs, and impressions.  Frequently, the

Government has done so by asking witnesses whether they had "concerns" about any people or

alleged practices at NECC and, if so, why:

> Q. [Joseph Connolly Direct]  Mr. Connolly, did you have concerns about any of
> the conditions within the clean room facility? (Cadden Tr. 11:108).
> A. Yes, but in passing. It didn't seem like people were making a big deal over it so
> I didn't. I kind of followed the herd not to.
>
>
> Q. [Deborah Faint Direct]  Did you ever have any concerns about that? [the
> alleged re-use of patient names]
> A I did think it was odd, but I didn't question it.  (Cadden Tr. 14:11).
>
>
> Q. [Owen Finnegan Direct]  Did you have concerns about the way he [Cory
> Fletcher] was filling?
> A. It was concerning, yeah. I mean, I think as I grew as a tech, it became more
> concerning seeing how he filled. Initially, I just thought maybe he was just kind of
> manic . . . .  (Cadden Tr. 14:104).
>
>
> Q. [Finnegan Direct]  Did that raise any concerns to you, this mixing of lots?
> A. Yes.  [Objection colloquy omitted]
> Q. Why?
> A. Because we didn't have results. So I didn't know – you know, who's to know
> what we're sending out is safe.  (Cadden Tr. 14:168).

Alternatively, the Government has asked witnesses what their "response" was to a

particular situation, which the witnesses have understood as a request to convey their reaction:

> Q [Robert Ronzio Direct]  Okay. What was the discussion in the meeting? [a post-
> contamination meeting of NECC and Ameridose management]
> A It was creating separation from AmeriDose to NECC, and kind of limiting
> damages to protect NECC [sic, AmeriDose].
> Q What was your response?
> A I was disgusted.
> Q Why?

> A Because here we are, going through this national crisis with NECC. I have employees upstairs who I care about like family, and all's they care about is AmeriDose. I actually had to raise my hand during the meeting to acknowledge that we had people and employees, what are we doing, and all's they were caring about was AmeriDose.  (Cadden Tr. 38:176)

Such questions are improper, for at least two reasons.  First, whether a witness harbored internal "concerns" about an event, a "practice," or a fellow employee at NECC is irrelevant. What matters is what the witness saw, did, heard, or said (subject to any other applicable rules of evidence that might limit such testimony).  Second, permitting the Government to ask witnesses to share their "concerns" and "responses" opens the door to a raft of irrelevant, prejudicial, and inadmissible testimony, as demonstrated above, when Owen Finnegan responded to questions about his "concerns" with Cory Fletcher by describing Fletcher as "manic;" to questions about his "concerns" with lot mixing by sharing his personal views on safety; and to questions about his "concerns" with Annette Robinson by conveying his opinion about whether she took her job seriously, how she even managed to secure employment at NECC, and why, from his "vantage point," her "purpose" as an employee was simply to gossip about others.  It likewise is demonstrated by Robert Ronzio's irrelevant and highly prejudicial description of his "disgust" with NECC and Ameridose management.

### 6.  Improper Speaking Objections

In the course of objecting during defense cross-examinations, the Government repeatedly has engaged in speaking objections, the substance of which has served both to coach the witness and make factual argument in front of the jury:

> Q. [Robert Ronzio Cross] And you understand now that that's because there had been a telephone call with the Board of Pharmacy and the CDC on the 25th, and they had asked for this list.

MR. VARGHESE: Objection, your Honor. He's already testified he doesn't know about the CDC.

THE COURT: He can answer. He can speak for himself.  (Cadden Tr. 39:30).


Q. [Ronzio Cross] You jumped in and assisted, but the time you jumped in, Mr. Cadden had already called every single client that had received the August lot because of his concern about that e-mail; isn't that right?

MR. VARGHESE: Objection. He can't testify about Mr. Cadden's --

THE COURT: He can speak for himself.  (Cadden Tr. 39:33).


Q [Annette Robinson Cross]  And are you aware that there are no other recommendations relating to temperature in USP-797?

MS. STRACHAN: Objection, your Honor. She testified she's not familiar with USP. To ask her that there's nothing else in there is --

THE COURT: She can say "yes" or "no" then to the question.  (Cadden Tr. 29:56).


Q [Robinson Cross]  . . . on each of those pages, do you agree with me that the findings on March 1, for example, 2012, unless I'm missing one again, are all perfect within the glove boxes and main clean room?

MS. STRACHAN: Objection, your Honor.

Q Is that correct?

THE COURT: The word "perfect," I don't think is a word --

MS. STRACHAN: And it's mischaracterizing the document.

THE COURT: Well, let the witness speak for herself.  (Cadden Tr. 29:86).

It is inappropriate for the Government to make speaking objections that serve to coach the witness and argue the Government's countervailing factual positions before the jury.  Where circumstances warrant providing a basis for an objection, the Government should be limited to setting forth a succinct rule-based explanation.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court issue an order that precludes the Government from engaging in the above-described practices during Trial 3.

Dated:  September 18, 2018                          Respectfully submitted,


JOSEPH M. EVANOSKY,                          GENE SVIRSKIY,
By his attorneys,                                      By his attorneys,


*/s/ Mark W. Pearlstein*                             */s/ Jeremy M. Sternberg*
Mark W. Pearlstein (BBO #542064)        Jeremy M. Sternberg (BBO #556566)
Dana M. McSherry (BBO #664430)        Christopher M. Iaquinto (BBO #685718)
Jennifer Aronoff (*admitted pro hac vice*)   HOLLAND & KNIGHT
MCDERMOTT WILL & EMERY LLP            10 St. James Avenue
28 State Street                                    11th Floor
Boston, Massachusetts 02109-1775        Boston, Massachusetts 02116
(617) 535-4000                                  (617) 854-1476
mpearlstein@mwe.com                        jeremy.sternberg@hklaw.com
dmcsherry@mwe.com                          christopher.iaquinto@hklaw.com
jaronoff@mwe.com


CHRISTOPHER M. LEARY,
By his attorneys,


*/s/ Paul V. Kelly*
Paul V. Kelly (BBO #267010)
Sarah W. Walsh (BBO #664232)
JACKSON LEWIS PC
75 Park Plaza
4th Floor
Boston, Massachusetts 02116
(617) 367-0025
paul.kelly@jacksonlewis.com
sarah.walsh@jacksonlewis.com

SHARON P. CARTER,
By her attorney,


/s/ Michael J. Pineault
Michael J. Pineault (BBO #555314)
CLEMENTS & PINEAULT, LLP
24 Federal Street
Boston, Massachusetts 02110
(857) 445-0135
mpineault@clementspineault.com


GREGORY A. CONIGLIARO,
By his attorney,


/s/ Daniel Rabinovitz
Daniel Rabinovitz (BBO #558419)
Shawn Lu (BBO #679755)
MURPHY & KING, PC
One Beacon Street, 21st Floor
21st Floor
Boston, Massachusetts 02108
(617) 423-0400
drabinovitz@murphyking.com


MICHELLE L. THOMAS,
By her attorney,


/s/ Michael C. Bourbeau
Michael C. Bourbeau (BBO #545908)
BOURBEAU AND BONILLA, LLP
Building K
80 Washington Street
Norwell, Massachusetts 02061
(617) 350-6565
mike@lawgenie.com


ALLA V. STEPANETS,
By her attorney,


/s/ John H. Cunha Jr.
John H. Cunha Jr. (BBO #108580)
Helen Holcomb (BBO #547538)
CUNHA & HOLCOMB, P.C.
One State Street
Suite 500
Boston, Massachusetts 02109-3507
(617) 523-4300
cunha@cunhaholcomb.com


KATHY S. CHIN,
By her attorney,


/s/ Joan M. Griffin
Joan M. Griffin (BBO #549522)
P.O. Box 133
Dublin, New Hampshire 03444
(617) 283-0954
griffin@lawjmg.com

**LOCAL RULE 7.1 CERTIFICATION**

I hereby certify that counsel for Defendants conferred with counsel for the United States in a good-faith effort to resolve the issues raised by this motion pursuant to Local Rule 7.1.

*/s/ Michael J. Pineault*
Michael J. Pineault

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on September 18, 2018.

*/s/ Michael J. Pineault*
Michael J. Pineault